OPINION OF THE COURT
Memorandum.
Order unanimously modified by denying tenant’s and undertenant’s cross motion and granting summary judgment to landlords awarding them possession and dismissing the counterclaim; as so modified, affirmed without costs.
Landlords, the sponsors of a cooperative conversion, commenced this holdover proceeding to recover possession of an apartment rented by tenant and “undertenant” (hereinafter tenants) subsequent to the conversion. Their petition alleged, inter alia, that tenants were not “non-purchasing tenants” *374 within the meaning of the Martin Act (General Business Law § 352-eeee) because they were not in possession at the time of the conversion. It also alleged that tenants had rejected a renewal lease offered by landlords. In their answer, tenants asserted as one of several affirmative defenses that they were “non-purchasing tenants,” and they counterclaimed for retaliatory eviction.
Landlords moved to strike tenants’ affirmative defenses and counterclaim, and tenants cross-moved to dismiss pursuant to “CPLR 3211 (a) and 3212.” In support of their cross motion, tenants argued that they were “non-purchasing tenants” because they were persons “to whom a dwelling unit is rented subsequent to the effective date” of the conversion plan (General Business Law § 352-eeee [1] [e]), that the lease offered them by landlords contained an unconscionable rent increase in violation of General Business Law § 352-eeee (2) (c) (iv), and that the eviction was retaliatory. They averred as follows: The building was converted in 1987. They moved into their apartment in February 1992 pursuant to a one-year lease at a rent of $625. Upon the expiration of that lease, landlords commenced a holdover proceeding, which proceeding was discontinued with prejudice after tenants claimed that they were “non-purchasing tenants.” After discontinuing the holdover proceeding, landlords commenced a nonpayment proceeding, which was ultimately settled, with tenants agreeing to pay $7,000 in arrears and landlords agreeing to, inter alia, give tenants a two-year renewal lease (commencing July 1, 1994) at a rent of $500 per month. In the interim, tenants had commenced a Housing Part (HP) proceeding (and they subsequently commenced a second HP proceeding) to compel landlords to repair numerous problems in the apartment. Despite the HP proceedings, landlords resisted making the repairs and did not complete them until April 1996. It was only upon the completion of the repairs that landlords, in November 1996, offered tenants a renewal lease at a proposed rent of $850 per month, a 70% increase over the $500 they had been paying. Tenants rejected this lease because, inter alia, they were advised by Legal Aid that the Jiggetts program would not pay more than $700 per month toward their rent.
For their part, landlords claimed that tenants were not “non-purchasing tenants” because they had moved into the apartment after the conversion and had sublet from “a purchaser under the plan,” defined broadly in the statute as the “person who owns the shares allocated to a dwelling unit” (General *375 Business Law § 352-eeee [1] [d]). Landlords also argued that even if tenants were “non-purchasing tenants” they had been afforded all the rights of such tenants because the proposed rent of $850 was not unconscionable. Landlords stated that the stipulated reduction of the rent to $500 was in settlement of tenants’ warranty-of-habitability claims and was not meant to be permanent; that tenants acknowledged that the court-ordered repairs had been completed in April 1996; that an increase over five years from $625 to $850 came to 6% a year; and that tenants had refused to cooperate with landlords’ contractors, had refused landlords access and had mounted a campaign of harassment against landlords involving, inter alia, repetitive complaints to HPD and the arrest and jailing of one of the landlords and the obtaining of a temporary restraining order barring him from the building. Landlords further stated that after discussions with real estate brokers and other landlords, they had learned that unfurnished one-bedroom apartments in the area rented for more than $850 and they had set the rent at this amount as a “conservative” figure; that a one-bedroom apartment of approximately the same size as tenants' across from tenants’ apartment is renting for $900 per month and a one-bedroom apartment downstairs is renting for $1,050; and that they had spent more money in renovating tenants’ apartment — by replacing the floors, the sheetrock on virtually all the walls, the ceilings, the refrigerator and the stove — than they had spent in renovating any other apartment. Landlords also submitted an affidavit from a licensed real estate broker with 30 years’ experience in the area attesting to the fact that $850 a month for a one-bedroom apartment in that building was reasonable and by no means unconscionable.
The Housing Court ruled that tenants were “non-purchasing tenants” within the meaning of the Martin Act and that because the petition alleged that they were not “non-purchasing tenants” it was fatally defective (citing, inter alia, MSG Pomp Corp. v Doe, 185 AD2d 798 [1st Dept]; Giannini v Stuart, 6 AD2d 418 [1st Dept]). Accordingly, the court dismissed the petition. The court did not reach the question whether the proposed rent was unconscionable.
We modify the order by providing that tenants’ cross motion is denied and, upon searching the record, by granting summary judgment to landlords (see, Merritt Hill Vineyards v Windy Hgts. Vineyard, 61 NY2d 106).
At the outset, we note that MSG Pomp Corp. v Doe (supra) and Giannini v Stuart (supra), whatever their continuing va *376 lidity in the First Judicial Department, are not controlling in this Department. The Appellate Division, Second Department, has ruled that, in the absence of prejudice to a party, it is permissible to amend the pleadings in summary proceedings even with respect to misstatements of the rent-regulated status of the tenancy (Villas of Forest Hills Co. v Lumberger, 128 AD2d 701; see, Birchwoods Tower #2 Assocs. v Schwartz, 98 AD2d 699, 700; Lin v Rivas, NYLJ, May 26, 1998, at 30, col 5 [App Term, 2d & 11th Jud Dists]). In the instant case, tenants were clearly prepared to litigate the status of their tenancy and were not in the least prejudiced by landlords’ claim in the petition that they were not “non-purchasing tenants.” Accordingly, the misstatement in the petition provides no basis for dismissal.
We entirely agree with the Housing Court’s conclusion that tenants are “non-purchasing tenants” within the meaning of the Martin Act. Admittedly, there are ambiguities and inconsistencies in the statute which lend support to the positions of both parties. On the one hand, the statute defines “[plurchaser under the plan” as the “person who owns the shares allocated to a dwelling unit” (General Business Law § 352-eeee [1] [d]) — a definition arguably broad enough to include a sponsor — and states that a “person who sublets a dwelling unit from a purchaser under the plan shall not be deemed a non-purchasing tenant” (General Business Law § 352-eeee [1] [e]). On the other hand, it defines “non-purchasing tenant” to include “a person to whom a dwelling unit is rented subsequent to the effective date” (General Business Law § 352-eeee [1] [e]), a definition which, after the exclusion of persons who rent from bona fide purchasers for occupancy, would seem to require the inclusion of persons who rent from sponsors. We are not persuaded by landlords’ claim that the statute should be read to mean “a person to whom a dwelling unit is rented subsequent to the effective date but prior to the closing date” because the emphasized words do not appear in the statute. Instead, we believe that a proper construction of the statute must be based upon an understanding of the protection that the Legislature intended to provide. It is a familiar principle that in construing a statute a court “should consider the mischief sought to be remedied * * * and * * * should construe the act in question so as to suppress the evil and advance the remedy” (McKinney’s Cons Laws of NY, Book 1, Statutes § 95; see, e.g., T.D. v New York State Off. of Mental Health, 228 AD2d 95, 106; Lincoln First Bank v Rupert, 60 AD2d 193, 197).
*377 General Business Law § 352-eeee is designed to promote the conversion of buildings to cooperative status while protecting tenants against the forced dislocations which might result from these conversions (Legislative Finding, L 1982, ch 555, § 1). The law provides for “eviction” and “non-eviction” plans. A sponsor who is able to obtain the agreement of 51% of the bona fide tenants in occupancy to purchase may file an “eviction plan.” A sponsor filing such a plan is barred from evicting non-purchasing tenants for at least three years and is permanently barred from evicting eligible senior citizens and disabled persons and from subjecting them to unconscionable rent “increases beyond ordinary rentals for comparable apartments” (General Business Law § 352-eeee [2] [d] [iii]). A sponsor who obtains written purchase agreements for 15% of the dwelling units from bona fide tenants or from “bona fide purchasers who represent that they intend * * * [to] occupy the dwelling unit when it becomes vacant” may file a “non-eviction plan” (General Business Law § 352-eeee [2] [c] [i]). A sponsor who files a noneviction plan is permanently barred from evicting nonpurchasing tenants based on “expiration of tenancy” and from subjecting such tenants to unconscionable increases (General Business Law § 352-eeee [2] [c] [ii], [iv]; see generally, Lang-dale Owners Corp. v Lane, 166 Misc 2d 439, 441-443).
It is apparent that the protections afforded nonpurchasing tenants were necessitated by the change in the owner’s economic incentives as a result of the conversion. In the case of a rental building, it is to the owner’s economic benefit to retain a nonobjectionable tenant who is paying a market rent. In that situation, the owner’s interest coincides with the tenant’s interest in not being dislocated and with the public interest in stable and undisrupted tenancies. However, after a conversion, the apartment may be more valuable to the owner empty than occupied by a tenant, even one paying a market rent. In that case, it is in the owner’s economic interest to evict the tenant, and the interest of the owner diverges from those of the tenant and the public. It is, in our view, against this financial incentive to displace the nonpurchasing tenant that the Legislature sought to protect. As the Legislative Finding (L 1982, ch 555, § 1) makes clear, there is a “public interest” in avoiding such dislocations, and statutes promoting a public interest are to be liberally construed (McKinney’s Cons Laws of NY, Book 1, Statutes § 341).
If this is so, there can be no valid distinction between tenants in possession at the time of the conversion and those *378 who rent from sponsors after the conversion. If a sponsor chooses to rent an apartment after a conversion rather than to sell it, this will ordinarily be because market conditions favor a rental over a sale. When these conditions change, the sponsor will again find it financially advantageous to discontinue renting. If it was the Legislature’s intention to protect tenants from dislocations caused by this shift in the owner’s economic interest, it could only address the problem thoroughly by protecting tenants that rent from sponsors after the conversion as well as those in possession at the time of the conversion.
We note that the record contains internal office guidelines issued in 1991 by the Director of the Real Estate Financing Bureau of the Office of the New York State Attorney General which reach a similar conclusion as to the proper interpretation of the statute.
Having determined that tenants are “non-purchasing tenants,” we turn to the question whether the lease renewal offered them contained an unconscionable rent. As noted, the Martin Act provides that a nonpurchasing tenant may not be subjected “to unconscionable increases beyond ordinary rentals for comparable apartments during the period of their occupancy. In determining comparability, consideration shall be given to such factors as building services, level of maintenance and operating expenses” (General Business Law § 352-eeee [2] [c] [iv]).
We do not read this provision, as do the tenants, as focusing on the size of the increase. Rather, its clear meaning is that the rent may not be increased beyond the rents being charged for comparable apartments. Contrary to what tenants may believe and the Housing Court may have indicated, the purpose of the statute was not to institute a system of rent regulation for “non-purchasing tenants” but to prevent sponsors from charging these tenants above-market rents as a means of forcing them out (see, Legislative Finding, L 1982, ch 555, § 1).
When measured against this statutory standard, the proposed rent of $850 was not unconscionable. As noted, landlords showed that comparable apartments in the building were renting for higher amounts, and they submitted an affidavit from an experienced real estate broker attesting to the reasonableness of the rent. For their part, tenants offered no proof from which the value of the apartment could be ascertained. Under the circumstances, landlords established that the rent was not unconscionable, and tenants were not within their rights in rejecting the proposed lease.
*379 With respect to tenants’ retaliatory eviction claim, it is noted that the eviction cannot be considered retaliatory in light of landlords’ offer to continue the tenancy at a not unconscionable rent. It therefore appears that tenants have no valid defense to the proceeding and no valid counterclaim, and summary judgment is granted awarding landlords possession and dismissing the counterclaim.
Scholnick, J. P., Aronin and Patterson, JJ., concur.